325 F.2d 367
 64-1 USTC P 12,202
 ESTATE OF Arthur H. HULL, Deceased, Central Trust Capital
Bank, Kathrine W. Hull and Margaret Hull Daniels,
Executors, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 14393.
 United States Court of Appeals Third Circuit.
 Argued Oct. 14, 1963.
Decided Nov. 29, 1963, Rehearing Denied Dec. 30, 1963.
 
 Robert R. Batt, Philadelphia, Pa. (William R. Spofford, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., on the brief), for petitioners.
 Timothy B. Dyk, Detp. of Justice, Washington, D.C., (Louis F. Oberdorfer, Asst. Atty. Gen., Lee. A. Jackson, Harry Baum, Michael K. Cavanaugh, Attys., Dept. of Justice, Washington, D.C., on the brief), for respondent.
 Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 In this case the Tax Court, sustaining a ruling of the Commissioner, has decided that Arthur Hull's irrevocable gratuitous transfer of full ownership rights in 15 policies of insurance on his own life to his three daughters equally, as accomplished about two and one-half years before his death, was a transfer 'in contemplation of his death' within the meaning of section 2035 of the 1954 Internal Revenue Code. Accordingly, the court required that the proceeds of these policies upon the death of the insured, a total of $130,923.38, be included in his gross estate for federal estate tax purposes. 1962, 38 T.C. 512. From this decision the decedent's executors have appealed.
 
 
 2
 The principal matter in dispute is the decedent's state of mind at the time of the transfer as indicated by various undisputed circumstances and occurrences.
 
 
 3
 Mr. Hull was a successful lawyer. When he died in 1957, at the age of 72, his survivors were his wife and the three daughters of a prior marriage, to whom he had made the questioned transfer of insurance policies in 1954. His will, made in 1950 shortly after his second marriage and at a time when all his daughters were adults, provided that the bulk of his estate be held in trust for his wife for her life with remainder to his three daughters equally.
 
 
 4
 In 1954 the decedent's daughter, Elizabeth, was divorced from her husband. The divorce settlement provided her with only $200 per month for the support of herself and three children. As a result of the divorce and consequent financial problems, this daughter suffered persisting emotional difficulty and a sense of insecurity. At her father's suggestion she moved to Harrisburg, his home city, and took up residence in a house which he purchased for her use and later devised to her in a 1955 codicil to his will. He also provided her with the sum of $300 monthly for her support until his death.
 
 
 5
 When the decedent transferred the insurance policies to his daughters he told them he was taking this step to ease the mind of Elizabeth and to provide her with financial security. He pointed out that the policies had substantial present cash value. Actually, each daughter received policies worth more than $20,000 at the time of transfer. He also stated that he was dividing the policies equally among the three daughters because it had always been his wish and practice to treat them alike. At the time of the transfers the daughters already were the equally sharing death beneficiaries designated in the policies, with the father as owner reserving the right to change the beneficiaries.
 
 
 6
 Since the transaction occurred less than three years before the donor's death and the Commissioner had found, in accordance with the presumption created by section 2035(b), that the transfer was made in contemplation of death, the petitioning executors had the burden of proving in the Tax Court that considerations connected with life rather than with the anticipation of death were the motivating or dominant cause of the transfer. However, neither the Commissioner's ruling nor the statutory presumption created by death within three years after the transfer is evidence of motivation. These circumstances merely imposed the burden of going forward with evidence and the burden of persuasion upon the petitioners. Belyea's Estate v. Commissioner, 3d Cir. 1953, 206 F.2d 262; Valetti v. Commissioner, 3d Cir. 1958, 260 F.2d 185.
 
 
 7
 Nor does it strengthen the Commissioner's position that the property was life insurance. That fact does not make the transfer inherently testamentary, Estate of Aaron v. Commissioner, 3d Cir. 1955, 224 F.2d 314, particularly in a case like this where full ownership rights were transferred unconditionally, and the policies had substantial cash value.
 
 
 8
 We turn now to the evidence relevant to decedent's motivation. He was 70 years old when he gave his life insurance policies to his daughters. However, the Tax Court found that he had never been hospitalized and had no medical history of serious illness. In the Tax Court's wards, he was 'an extremely active individual with his interests centered around his profession, his family and his friends. He was primarily concerned with life and living and had never manifested any special concern about death or the disposition of his property thereafter'. 38 T.C. at 519. His first serious illness occurred more than two years after the gift of the insurance policies and less than a month before his death. This, therefore, is the unusual case where the evidence and the Tax Court's findings prevent the age of a septuagenarian and the occurrence of his death fairly soon after a property disposition from affording any logical basis for an inference that his action was dictated either by any though of impending death or by any desire for anticipatory achievement of an intended testamentary disposition.
 
 
 9
 On the special facts of this case, the Tax Court in its opinion and all parties on this appeal recognize that fatherly concern for the well-being of Elizabeth was the dominant reason for the transfer of property, while the inclusion of equal provision for the other two daughters reflected no more than a father's established policy of treating all of his children alike. The disputed question is whether the dominant though in the father's mind was to do something immediately beneficial for Elizabeth during his lifetime or to assure a desired provision for her after his death.
 
 
 10
 Unquestionably, Elizabeth had experienced a depressing change of circumstances and had become dependent upon her father's bounty. The record makes it clear that she was distressed and insecure and that her mental state seriously concerned her father. Therefore, the father's statements to his daughters that the transfer of the insurance policies was intended to relieve Elizabeth's worry and to give her an emotional lift were entirely credible. Indeed, the Tax Court recognized that on the evidence this court have been the reasoning and the dominant motivation of the father. But the court found it no less probable that the father's dominant concern was to give Elizabeth such security after this death as would be provided by the proceeds of his life insurance. In this connection, it is true that Elizabeth would have need for assistance when her father should die, since the $300 monthly payments would cease and her father's will postponed his daughters' enjoyment of the bulk of his estate so long as his wife should survive him. However, each daughter was already the named beneficiary of one-third of his life insurance. Therefore, the death benefits Elizabeth would control after the transfer of the policies to her were exactly the same as those which she would in any event receive as beneficiary if her father had retained the policies unaltered as his own property. It is not reasonable to believe that the motive for the transfer of full ownership rights was to provide for a distribution of death benefits that was already assured without need for any further action.[1] Beyond this, by transferring the policies to Elizabeth her father actually diminished the likelihood that she would receive the full face value of the policies upon his death. For by this transfer he put it within her power to surrender the policies at any time for cash value, to borrow upon them or to make some other person the death beneficiary. We cannot conceive of a rational person seeking to achieve an end by means which obviously make the realization of that end less likely.
 
 
 11
 The government also points out that the daughters never attempted to control the policies from the time of transfer until the decedent's death. The policies were kept in a safe at Mr. Hull's law office and he continued to pay the annual premiunms after the transfer. But we do not regard these facts as indicating that the decedent had an intention different from what he professed. It would be quite natural for a lawyer to keep important documents belonging to his daughters in a safe place. The father's gift was merely emlarged by his premium payments. And the fact that the daughters exercised none of their rights of ownership prior to decedent's death is not significant, since no emergency requiring their use ever arose.
 
 
 12
 In these circumstances we think this record provides no rational basis for inferring that concern for Elizabeth's security after his death motivated the gift of insurance policies. On the other hand, the stated purpose of immediately improving her mental and emotional state was entirely plausible and should have been accepted as dominant in her father's mind.
 
 
 13
 The decision of the Tax Court will be reversed.
 
 
 
 [1]
 This is not a case like City Bank Farmers Trust Co. v. McGowan, 1945, 323 U.S. 594, 65 S.Ct. 496, 89 L.Ed. 483, where the Supreme Court found no evidence of any motivation other than the though that heirs might as well have now what they would otherwise inherit on the donor's death. Here the inter vivos transfer gave the daughters valuable present property rights different from those which they otherwise would acquire upon their father's death